IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

DARLA J. VAN WINTERS,         )
                                      )
Plaintiff,                  )
                                      )
v.                       )
                                      )    Case No.  1:12-CV-71-SPM
                                      )
                                      )
CAROLYN W.  COLVIN,[1]      )
Acting Commissioner of Social Security,  )
                                      )
Defendant.                )

## MEMORANDUM OPINION

This is an action under 42 U.S.C. § 405(g) for judicial review of the final decision of Defendant Carolyn W. Colvin, the Acting Commissioner of Social Security, denying the application of Plaintiff Darla Van Winters ("Plaintiff") for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, *et seq.* (the "Act").  The parties consented to the jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c).  (Doc. 19).  Because I find the decision denying benefits was supported by substantial evidence, I will affirm the Commissioner's denial of Plaintiff's application.

## I.      PROCEDURAL HISTORY

On October 20, 2008, Plaintiff applied for SSI; that application was initially denied.  (Tr. 110-13, 58).  On December 29, 2008, Plaintiff filed a Request for Hearing by Administrative Law Judge (ALJ).  (Tr. 73-80).  After a hearing held on April 14, 2010, the ALJ issued an unfavorable decision on August 18, 2010.  (Tr. 8-24).  Plaintiff filed a Request for Review of

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin should therefore be substituted for Michael J. Astrue as the defendant in this case.

Hearing Decision with the Social Security Administration's Appeals Council on August 18, 2010, but the Council declined to review the case on March 7, 2012.  (Tr. 1-7)  Plaintiff has exhausted all administrative remedies, and the decision of the ALJ stands as the final decision of the Commissioner of the Social Security Administration.

## II.    FACTUAL BACKGROUND

### A. BACKGROUND

At the time of her hearing in this case, Plaintiff was 49 years old, had an eleventh grade education, and lived in her boyfriend's house.  (Tr. 30-31).  Plaintiff had not looked for work in about a year.  (Tr. 42).

In her disability paperwork, Plaintiff alleged a disability onset date of May 2, 2008; at the hearing, her attorney amended the onset date to October 20, 2008, the date her application was filed.  (Tr. 29, 140).  On May 2, 2008, Plaintiff was fired from her job packaging bowls because her "progress wasn't good enough" and she was not fast enough.  (Tr. 36-37, 46).  Her back and breathing problems kept her from performing at the fast pace the job required.  (Tr. 46).  Prior to that job, Plaintiff had jobs as a dietary aide in a nursing home, a switch maker on an assembly line, a potato trimmer, and a potato cleaner.  (Tr. 32-36).

Plaintiff testified that her ability to work is limited primarily by her foot and her back.  (Tr. 37-38).  Plaintiff broke her right ankle on October 31, 2009, after tripping in the yard.  (Tr. 37, 45).  Her right ankle hurts and swells up.  (Tr. 28).  She takes Tylenol and props her foot up about five hours out of an eight-hour day.  (Tr. 45, 47).  Her back pain is located at the lower part, between her hips; it hurts if she sits or stands too long in one spot.  (Tr. 38, 44).  She takes

Flexeril[2] for her back.  (Tr. 44).  She thinks her back and foot are getting worse.  (Tr. 42).

Because of the pain, Plaintiff sleeps at most five hours a night.  (Tr. 47).  Plaintiff testified that

the heaviest amount she could lift or carry occasionally was five or ten pounds, that she could

stand for about fifteen minutes at a time, that she could sit for maybe 30 minutes at a time, and

that she could not walk very far.  (Tr. 38).

Plaintiff's left wrist bothers her when she lifts around three or four pounds.  (Tr. 42).  It

has been bothering her as far back as 2008 or earlier.  (Tr. 46).

Plaintiff began having breathing problems in 2006, and she uses an albuterol[3] inhaler four

times a day.  (Tr. 43).  She once had to leave a job because she had problems breathing when she

had to help clean.  (Tr. 34).  She testified that she could walk 20 or 30 yards without being short

of breath.  (Tr. 43).  She has smoked for over 30 years and currently smokes about a pack a day,

down from two packs.  (Tr. 44).

Plaintiff also has depression and has been taking medication for it for four years.  (Tr.

46).  She has no side effects from her medications.  (Tr. 49).  She made several suicide attempts

when she was very young, but none in the last two or three years.  (Tr. 48).  She currently takes

citalopram;[4] it helps "a little bit."  (Tr. 39).  She also has anxiety or panic attacks lasting about

ten minutes, two or three times a month; they occur more often when she is out in public.  (Tr.

46, 48).  She has crying spells about three to five times a month, and she appeared to be having

---

[2] Flexeril is a brand name for cyclobenzaprine; it is a muscle relaxant used to relief pain and
discomfort caused by strains, sprains, and other muscle injuries.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682514.html.

[3] Albuterol is used to prevent and treat wheezing, difficulty breathing, chest tightness, and
coughing caused by lung diseases such as asthma and COPD.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a607004.html

[4] Citalopram is used to treat depression.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a699001.html.

one during the hearing.  (Tr. 48).  She sometimes forgets to take her medicine and gets confused about money, and it took her several attempts to get her driver's license.  (Tr. 49-50).

Plaintiff spends her days watching television and playing with her dog.  (Tr. 41).  She folds clothes, dusts, and cooks some meals.  She enjoys barbecuing with friends and went to a friend's house a couple of weeks before the hearing.  She visits friends once or twice a month, and they visit her.  (Tr. 40).  She gets along with her friends, neighbors, and boyfriend.  She leaves the house "only when [she] can get dragged out of it."  (Tr. 41).  The housework is done by Plaintiff's boyfriend's housecleaner.  (Tr. 39).

### B. MEDICAL RECORDS

Medical records from 2006 and 2007 (prior to Plaintiff's alleged disability onset date) indicate a history of depression, bronchitis, COPD, chest pain, shortness of breath, cough, migraines, and lower back discomfort.  (Tr. 214-16, 220-22, 225-29, 232-33, 235, 237-38).

On October 22, 2008, Plaintiff filled out a medical history form for the Kennett Family Clinic stating that her depression was worse, her lower back and legs were hurting a lot, her left wrist was going out on her, and her headaches were coming back.  (Tr. 181).

On October 28, 2008, Plaintiff saw Dr. Betina Laiolo, M.D., at the Kennett Family Clinic, for a full evaluation of depression and to establish care.  She reported that she had trouble sleeping, decreased energy, and decreased concentration.  She also stated that she had been taking Celexa (citalopram) but it did not seem to be working.  Her medications were noted to be Spiriva,[5] citalopram, Flexeril, albuterol, Advil as needed for back pain, and Mucinex as needed for cough.  Dr. Laiolo noted Plaintiff had a history of COPD, tobacco abuse, and major depressive disorder.  On examination, Plaintiff was alert, oriented, cooperative, and in no acute

---

[5] Spiriva is an anticholinergic used to treat COPD.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a604018.html

4

distress, and her lungs were clear to auscultation, with no wheezes, rales, or crackles.  Dr. Laiolo assessed major depressive disorder and started Plaintiff on Paxil.[6]  She also diagnosed COPD, counseled Plaintiff regarding smoking, and gave her samples of albuterol and Spiriva.  (Tr. 178-79).

On November 5, 2008, Plaintiff saw Dr. Price Gholson, Psy.D., for a disability evaluation.  (Tr. 184).  Plaintiff reported depression, worry about her children, worry about "getting by in life," some sleep difficulty, and some loss of energy and concentration; however, she stated that life in general was "good."  (Tr. 184-85).  Dr. Gholson noted that Plaintiff experienced anxiety, financial problems, difficulty sleeping at times, and long-term memory loss.  (Tr. 185).  Dr. Gholson assessed major depressive disorder and assigned a Global Assessment of Functioning ("GAF") score of 65.[7]  (Tr. 189).  Dr. Gholson opined that Plaintiff did not have a mental or physical disability which would prevent her from engaging in that employment or gainful activity for which her age, training, experience, or education would fit her.  (Tr. 183).

---

[6] Paxil is a selective serotonin reuptake inhibitor used to treat depression. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a698032.html

[7] The Global Assessment of Functioning Scale (GAF) is a psychological assessment tool wherein an examiner is to "[c]onsider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness"; it does "not include impairment in functioning due to physical (or environmental) limitations."  *Diagnostic and Statistical Manual of Mental Disorders (DSM-IV)*, 32 (4th ed. 1994).  A GAF score of 61-70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."  *DSM-IV* 32.

Also on November 5, 2008, Plaintiff saw Dr. Mina Massey, M.D., for a consultative examination.  Plaintiff reported that she had COPD and left wrist weakness, could not work where there might be chemicals, and had some fluid retention in her feet if she stands for long periods.  Dr. Massey noted that Plaintiff had dyspnea on exertion, a few scattered wheezes in her right lung, and decreased breath sounds bilaterally.  Dr. Massey noted weakness in Plaintiff's left wrist.  She diagnosed COPD and recommended a pulmonary evaluation.  She stated that Plaintiff's "functional capacity would be limited if physical exertion were required" and opined that Plaintiff did have a mental and/or physical disability which would prevent her from engaging in that employment or gainful activity for which her age, training, experience or education would fit her.  Dr. Massey estimated the expected duration of Plaintiff's disability to be three to five months.  (Tr. 193-94).

On November 11, 2008, Plaintiff saw Dr. Barry Burchett, M.D., for an internal medicine examination.  (Tr. 197-202).  Plaintiff reported COPD, depression, and "trouble with [her] wrist."  She reported exertional shortness of breath, "particularly with activities that may involve heavy lifting in a rush."  She complained of frequent coughing and wheezing.  She stated that she can shop at Wal-Mart so long as she keeps a casual pace.  Plaintiff reported pain in her left wrist, particularly when playing tug-of-war with a neighbor's dog, but stated she had not seen a physician for that issue and no X-rays had been taken of her wrist.  (Tr. 197).  Dr. Burchett described Plaintiff's appearance, mood, orientation, and thinking as "appropriate" and noted that her recent and remote memory for medical events was good.  (Tr. 198).  On examination of Plaintiff's lungs, he noted mild to moderate rhonchi present bilaterally; however, her lungs were clear to percussion and auscultation, without wheezing, and she had no shortness of breath with exertion or while lying flat.  (Tr. 199).  Plaintiff's left wrist had a full range of motion and was

6

not tender.  The left hand's grip strength was slightly diminished compared to the right, but within normal limits to finger squeeze.  Her dorsolumbar spine had normal curvature, and her straight leg test was negative in both the sitting and supine positions.  His impression was that Plaintiff suffered from emphysema/COPD and possible tendonitis of the left wrist.  (Tr. 200).

On December 1, 2008, Dr. Joan Singer, Ph.D., a non-examining psychologist, reviewed Plaintiff's file and completed a Psychiatric Review Technique form.  (Tr. 203-13).  Dr. Singer indicated Plaintiff suffered from depression.  (Tr. 206).  Dr. Singer found that Plaintiff had mild difficulties in maintaining concentration, persistence, or pace, but no restriction in activities of daily living, no difficulties in maintaining social functioning, and no repeated episodes of decompensation of extended duration.  (Tr. 211).  She found Plaintiff's limitations were non-severe.  (Tr. 213).

On November 1, 2009, Plaintiff stepped on a log and injured her ankle, and she was brought to the Barnes Jewish Hospital ("BJH") emergency department.  (Tr. 586).  At the emergency department on November 1, her respirations were unlabored and she denied complaints, there was good air exchange bilaterally, and her lungs were clear and equal to auscultation bilaterally.  (Tr. 585-86, 590, 597).  After several radiographic views were taken of her right ankle, she was diagnosed with an ankle fracture and admitted to the hospital.  (Tr. 608-09, 611).  On November 2, she was noted to have "crackles" in her lungs and a wet, non-productive cough.  (Tr. 281).  On November 2, she underwent a closed reduction and multiplanar external fixation surgery.  (Tr. 638-39).  On November 3, Plaintiff had a CT scan that revealed "externally fixated intraarticular right ankle trimalleolar fracture with mild articular incongruence."  (Tr. 696).  She was discharged on November 3, 2009, in "good" condition, told

to ice and elevate her right lower extremity, and told to schedule an appointment for another surgery.  (Tr. 568).

On November 9, 2009, Plaintiff returned to BJH for additional surgery for "removal of external fixator" and "open reduction and internal fixation of right trimalleolar ankle fracture with internal fixation of the posterior lip."  (Tr. 369).  Prior to surgery, Plaintiff's lungs were clear to auscultation bilaterally, though her airway clearance was "thick."  (Tr. 383, 397).  The procedure was completed without complications, and a radiographic report on the same day showed "near anatomic alignment" at the ankle mortise.  (Tr. 371, 428).  Plaintiff received physical and occupational therapy while at BJH; her records indicate that she had generalized pain and extremity pain, as well as problems with mobility and a need for assistance in performing activities of daily living; all of those improved to some degree during her hospital stay.  (Tr. 442-52, 551-53).  Plaintiff was discharged on November 11, 2009, and instructed to keep her splint clean and dry and to elevate her right leg as much as possible.  (Tr. 322-32).  Her outpatient medication profile included Flexeril, acetaminophen-hydrocodone,[8] albuterol, Spiriva, and Lexapro.[9]  (Tr. 322).

On November 25, 2009, Plaintiff returned to BJH.  (Tr. 242-44).  It was noted that she was not experiencing pain that day.  (Tr. 243).  She did indicate that she had difficulty walking and difficulties with activities of daily living.  Nevertheless, the record indicates that "no functional interventions [were] required at this time."  (Tr. 242).  It was also noted that Plaintiff smoked 20 cigarettes a day and was "not interested in quitting."  (Tr. 243).  Radiography of

---

[8] Hydrocodone is used in combination with other ingredients to relieve moderate to severe pain and to relieve cough.  http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601006.html.

[9] Lexapro is a brand name for escitalopram and is used to treat depression and generalized anxiety disorder.  http://www.nlm.nih.gov/medlineplus/druginfo/meds/a603005.html.

Plaintiff's ankle revealed moderate swelling and that the "[r]ight trimalleolar ankle fracture [was] in near anatomic alignment post ORIF."  (Tr. 245).

### C.  VOCATIONAL EVIDENCE

Vocational Expert ("VE") Susan Shay, a Certified Rehabilitation Counselor, testified at the hearing before the ALJ.  (Tr. 51-56).  The ALJ posed the following hypothetical to the VE:

> [A]ssume a younger individual under the age of 50 with a limited eleventh grade education.  I'd like you to assume that such person could perform light work which involves lifting and carrying 20 pounds occasionally, ten pounds frequently, standing and walking at a total of about six hours in eight.  Sitting a total of about six hours in eight . . . [is not required to use] ladders, ropes or scaffolds, occasional balancing, kneeling, crouching, crawling and stooping and occasional ramps and stairs.  We'll start out with no limits in handling or fingering with either hand . . . Simple, routine tasks.  Reading, writing, language should be required occasionally at most.  No concentrated exposure to pulmonary irritants.  No rigorous production pace or strict production standards and what I mean by that would be for example . . . no work on an assembly line where the worker could not control the speed of the line or no piece work that's paid on a piece rate.  Superficial interaction with coworkers, supervisors and the general public.  Starting with that would such a person be able to perform any of the past work?

(Tr. 52-53).  The VE testified that such an individual would not be able to perform Plaintiff's past work, but the VE identified several other jobs such a person would be able to perform.  Upon questioning by the ALJ, the VE testified that such a person could still perform those jobs if she were off-task for ten to fifteen combined minutes in the morning and ten to fifteen combined minutes in the afternoon (outside of customary work breaks), and were absent a maximum of two days from work per month.  (Tr. 54-55).  The ALJ then described a second hypothetical individual:

> [Otherwise identical to previous hypothetical, except] add that handling with the non-dominant left hand would be occasional and then still no limits on handling or fingering with the dominant right, would that change your answer?

9

The VE testified that the hypothetical person would be able to do no work at all.  (Tr. 54).  The ALJ then described a third hypothetical individual:

> [L]et's take the first hypothetical question but change it to sedentary which is lifting ten pounds occasionally, standing and walking a total of two hours in eight, sitting a total of six hours in eight, no limitations handling and fingering and all of the other non-exertional limitations that I cited in the first hypo, no ladders, ropes, scaffolds, occasional postural, no concentrated exposure to pulmonary irritants, [and no rigorous production pace or strict production standard] are there any occupations that such a person could perform?

The VE testified that such a person would not be able to do any work at all.  (Tr. 55).

Upon questioning by Plaintiff's attorney, the VE testified that if a hypothetical individual limited to light or sedentary work were required to have one of her legs propped up at least 50% of the time, that individual would not be able to do any work "that's typically performed."  (Tr. 56).

## III.   STANDARD FOR DETERMINING DISABILITY UNDER THE ACT

The Social Security Act defines as disabled a person who is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A); *see also Hurd v. Astrue*, 621 F.3d 734, 738 (8th Cir. 2010).  The impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work."  42 U.S.C. § 1382c(a)(3)(B).

A five-step regulatory framework is used to determine whether an individual claimant qualifies for disability benefits.  20 C.F.R. § 416.920(a); *see also McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011) (discussing the five-step process).  At Step One, the ALJ determines whether the claimant is currently engaging in "substantial gainful activity"; if so, then he is not disabled. 20 C.F.R. § 416.920(a)(4)(i); *McCoy*, 648 F.3d at 611.  At Step Two, the ALJ determines whether the claimant has a severe impairment, which is "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities"; if the claimant does not have a severe impairment, he is not disabled.  20 C.F.R. §§ 416.920(a)(4)(ii), 416.920(c); *McCoy*, 648 F.3d at 611.  At Step Three, the ALJ evaluates whether the claimant's impairment meets or equals one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "listings").  20 C.F.R. § 416.920(a)(4)(iii).  If the claimant has such an impairment, the Commissioner will find the claimant disabled; if not, the ALJ proceeds with the rest of the five-step process.  20 C.F.R. § 416.920(d); *McCoy*, 648 F.3d at 611.

Prior to Step Four, the ALJ must assess the claimant's "residual functional capacity" ("RFC"), which is "the most a claimant can do despite [his] limitations."  *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)); *see also* 20 C.F.R. § 416.920(e).  At Step Four, the ALJ determines whether the claimant can return to his past relevant work, by comparing the claimant's RFC with the physical and mental demands of the claimant's past relevant work.  20 C.F.R. §§ 416.920(a)(4)(iv), 416.920(f); *McCoy*, 648 F.3d at 611.  If the claimant can perform his past relevant work, he is not disabled; if the claimant cannot, the analysis proceeds to the next step.  *Id.*  At Step Five, the ALJ considers the claimant's RFC, age, education, and work experience to determine whether the claimant can make an adjustment to other work in the national economy; if the claimant cannot make an adjustment to

other work, the claimant will be found disabled.  20 C.F.R. § 416.920(a)(4)(v); *McCoy*, 648 F.3d at 611.

Through Step Four, the burden remains with the claimant to prove that he is disabled. *Moore*, 572 F.3d at 523.  At Step Five, the burden shifts to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy.  *Id.*; *Brock v. Astrue*, 674 F.3d 1062, 1064 (8th Cir. 2012).

## IV.   DECISION OF THE ALJ

Applying the foregoing five-step analysis, the ALJ here found that Plaintiff had not engaged in substantial gainful activity since October 20, 2008, the date of Plaintiff's application for SSI.  (Tr. 13).  The ALJ found that Plaintiff had the following severe impairments: chronic obstructive pulmonary disease (COPD), bronchitis secondary to tobacco abuse, migraine headaches, possible left wrist tendonitis, depression, and a trimalleolar fracture of the right ankle which occurred after the alleged onset date.  (Tr. 13).  The ALJ found that Plaintiff did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 13).  The ALJ found that Plaintiff had the RFC to perform light work as defined in 20 C.F.R. 416.967(b), meaning the she is able to lift and/or carry 20 pounds occasionally and ten pounds frequently, stand and/or walk six hours total in an eight-hour workday, sit six hours total in an eight-hour workday, and has no limits on handling or fingering.  (Tr. 14).  She was also limited to jobs with no concentrated exposure to pulmonary irritants; no rigorous production pace or strict production standards; only simple routine tasks requiring, at most, occasional reading, writing and language; and superficial interaction with co-workers, supervisors, and the general public.  (Tr. 14).

The ALJ found that Plaintiff could not perform her past relevant work.  (Tr. 20).
However, relying on the testimony of the VE, the ALJ concluded that considering Plaintiff's age,
education, work experience, and RFC, there were jobs that existed in significant numbers in the
national economy that Plaintiff could perform.  (Tr. 20).  The ALJ concluded that the Plaintiff
had not been under a disability, as defined in the Act, since October 20, 2008, the date the
application was filed.  (Tr. 21).

In appealing the ALJ's decision, Plaintiff contends the ALJ's decision should be reversed
because (1) the ALJ erred in failing to consider awarding Plaintiff benefits for a closed period of
time; (2) the ALJ failed to conduct a proper credibility analysis; and (3) the ALJ's assessment of
Plaintiff's RFC was not based on medical evidence.

## V.      DISCUSSION

### A.  STANDARD FOR JUDICIAL REVIEW

The court's role in reviewing the Commissioner's decision is to determine whether the
decision "'complies with the relevant legal requirements and is supported by substantial evidence
in the record as a whole.'"  *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (quoting
*Ford v. Astrue*, 518 F.3d 979, 981 (8th Cir. 2008)).  "Substantial evidence is 'less than
preponderance, but enough that a reasonable mind might accept it as adequate to support a
conclusion.'"  *Renstrom v. Astrue*, 680 F.3d 1057, 1063 (8th Cir. 2012) (quoting *Moore v.
Astrue*, 572 F.3d 520, 522 (8th Cir. 2009)).  In determining whether substantial evidence
supports the Commissioner's decision, the court considers both evidence that supports that
decision and evidence that detracts from that decision.  *Id.*  However, the court "'do[es] not
reweigh the evidence presented to the ALJ, and [it] defer[s] to the ALJ's determinations
regarding the credibility of testimony, as long as those determinations are supported by good

reasons and substantial evidence.'"  *Id.* (quoting *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006)).  "If, after reviewing the record, the court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision.'"  *Partee v. Astrue*, 638 F.3d 860, 863 (8th Cir. 2011) (quoting *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005)).

## B.  AWARD OF BENEFITS FOR A CLOSED PERIOD

Plaintiff's primary argument is that the ALJ failed to consider awarding benefits for a closed period of time.  The Commissioner may award Social Security disability benefits either on a continuing basis or, where a once-disabling condition later ceases to be disabling, for a "closed period."  *Harris v. Sec'y of Dep't of Health & Human Servs.*, 959 F.2d 723, 724 (8th Cir. 1992); *see also, e.g.*, *Quaite v. Barnhart*, 312 F. Supp. 2d 1195, 1200-01 (E.D. Mo. 2004) (affirming the ALJ's decision to award disability benefits for a closed period ending on a specific date where there was substantial evidence to support the ALJ's conclusion that Plaintiff had ceased being disabled as of that date).  However, to qualify for a closed period of disability, the disabling condition must last for at least twelve months.  42 U.S.C. § 423(d)(A); *Karlix v. Barnhart*, 457 F.3d 742, 747 (8th Cir. 2006) (rejecting a claimant's argument that the ALJ failed to consider whether he was entitled to a closed period of disability based on an impairment that lasted for about ten months; stating, "By itself, any impairment during this time failed to meet the duration requirement for the Act's definition of disabled); *Holt v. Colvin*, No. 4:11-cv-754-DPM-BD, 2013 WL 1222392, at *1 (E.D. Ark. March 25, 2013) ("Even a closed period of disability must last at least one year.").

It is difficult to evaluate Plaintiff's argument, because Plaintiff does not specify any particular time period for which the ALJ should have considered awarding a closed period of

benefits.  Defendant speculates that Plaintiff may be suggesting that she should be awarded a closed period of benefits based on the ankle injury she suffered on November 1, 2009.  (Doc. 20, Def.'s Br. at 7).  However, impairments related to that injury would not qualify Plaintiff for a closed period of benefits.  The ALJ clearly found that Plaintiff's ankle injury was not disabling as of the date of his decision on August 18, 2010: after reviewing the medical records related to her ankle injury, considering the lack of treatment records in the eight months after her initial ankle surgeries, and analyzing the credibility of her subjective complaints regarding her ankle injury, he found that a limitation "to work at the light exertional level would account for any limitations caused by this impairment."  (Tr. 16).  Because the ALJ found the Plaintiff not disabled by the date of his decision, less than ten months after the ankle impairment began, it could not have satisfied the twelve-month duration requirement for a closed period of disability.  *See Roach v. Astrue*, No. 1:08-cv-01038, 2009 WL 1740353, at *6 (W.D. Ark. June 19, 2009) (holding that a claimant was not entitled to a closed period of disability because "*at the very best*, Plaintiff established she was disabled for eleven months . . . .  This showing is not sufficient to establish twelve months of disability.").

In her brief, Plaintiff also mentions her left wrist tendonitis, respiratory impairments, migraine headaches, and depression.  However, the ALJ did not base his findings regarding those impairments primarily or exclusively on evidence from 2009 or 2010, which might have left open the possibility that the impairments were disabling for twelve months at an earlier point in the relevant time period but had improved.  To the contrary, all or nearly all of the medical records related to those conditions—including most of the medical records on which the ALJ relied—were from late 2008.  With regard to Plaintiff's wrist, the ALJ relied on 2008 records showing some wrist pain but showing a full range of motion and only slightly diminished grip

strength.  (Tr. 17, 42, 46, 200).  With regard to Plaintiff's respiratory problems, the ALJ relied on a 2008 examination showing no shortness of breath and only normal, mild, or moderate examination findings.  (Tr. 16-17, 222).  With regard to Plaintiff's headaches, the ALJ relied on records from 2006, 2007, and 2008 showing only infrequent headaches.  (Tr. 17, 181, 216, 226). With regard to Plaintiff's depression, the ALJ analyzed evidence from throughout the relevant time period and noted that a November 2008 GAF score of 65 reflected only mild symptoms and was consistent with his RFC assessment; he also mentioned that a non-examining psychologist concluded in December 2008 that Plaintiff's depression was non-severe.  (Tr. 17-19, 189, 203-13).  Neither the medical evidence nor Plaintiff's testimony suggest that any of those conditions worsened after 2008, either temporarily or permanently.

After reviewing the parties' briefs, Plaintiff's testimony, and the medical records, the Court finds no evidence to suggest that any of Plaintiff's impairments, alone or in combination, were disabling for at least twelve months during the May 2008 to August 2010 time frame and then ceased to be disabling, such as would have suggested entitlement to a closed period of disability.  Thus, the Court finds that the lack of a specific discussion of a closed period of disability in the ALJ's decision does not warrant remand.

### C. THE ALJ'S CREDIBILITY DETERMINATION

Plaintiff also appears to challenge the ALJ's assessment of the credibility of her subjective complaints, though it is unclear from her brief how she believes the ALJ's assessment was deficient.  (Doc. 12, Pl.'s Br. at 9-10).  When evaluating the credibility of a claimant's subjective complaints, the ALJ must consider several factors: "(1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions;

(6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints." *Moore v. Astrue*, 572 F.3d 520, 524 (8th Cir. 2009) (citing *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008) and *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984)). "'An ALJ who rejects subjective complaints must make an express credibility determination explaining the reason for discrediting the complaints.'" *Moore*, 572 F.3d at 524 (quoting *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000)). However, the ALJ need not explicitly discuss each factor. *Id.* (citing *Goff v. Barnhart*, 421 F.3d 785, 791 (8th Cir. 2005)). It is sufficient if the ALJ " 'acknowledges and considers the factors before discounting a claimant's subjective complaints.'" *Id.* The ALJ may not discount allegations of disabling pain solely because they are not fully supported by the medical evidence, but such allegations may be found not credible if they are inconsistent with the record as a whole. *Ellis v. Barnhart*, 392 F.3d 988, 996 (8th Cir. 2005).

Here, the ALJ considered several of the relevant factors in finding Plaintiff's subjective complaints not fully credible. The ALJ considered Plaintiff's work history, noting that Plaintiff had worked "only sporadically prior to the alleged disability onset date"; work history records indicate that she had worked in only five of the fifteen years preceding her alleged disability onset date. (Tr. 19, 132, 158-63). *See Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001) (noting that "[a] lack of work history may indicate a lack of motivation to work rather than a lack of ability"). The ALJ also considered that she was able to work in 2006 and 2007, despite the fact that several of her alleged impairments existed at that time, which undermined the credibility of her claims that her impairments were completely disabling. (Tr. 19, 36, 179, 181, 214-16, 222, 222-26, 228-29, 237-38). *See Goff v. Barnhart*, 421 F.3d 785, 792 (8th Cir 2005) ("The fact that Goff worked with the impairments for over three years after her strokes, coupled

17

with the absence of evidence of significant deterioration in her condition, demonstrate the impairments are not disabling in the present").

The ALJ also properly considered the absence of objective medical evidence to fully support Plaintiff's alleged impairments.  *See Forte v. Barnhart*, 377 F.3d 892, 895 (8th Cir. 2004) ("[L]ack of objective medical evidence is a factor an ALJ may consider.").  With respect to Plaintiff's wrist impairment, he noted that there were no X-rays or other objective medical evidence in support of Plaintiff's wrist pain and that examination had revealed a normal range of motion in her wrist and a finger squeeze within normal limits.  (Tr. 16-17, 194, 197, 199, 200).  With respect to Plaintiff's respiratory ailments, he noted that a consultative examiner had found no shortness of breath during his examination, only mild to moderate rhonchi bilaterally, and that Plaintiff's lung fields were clear to percussion and auscultation without wheezes or rales.  (Tr. 17, 199).  With respect to Plaintiff's depression, he noted that her GAF score of 65 indicated only mild psychological symptoms.  (Tr. 17-18, 189).  With respect to Plaintiff's alleged back pain, the ALJ properly found that there was no objective medical evidence to prove the existence of any back impairment; moreover, Dr. Burchett found that her dorsolumbar spine had normal curvature, and her straight leg test was negative in both the sitting and supine positions.  (Tr. 16, 200).

In addition, the ALJ noted that no treating physicians had assigned Plaintiff restrictions beyond those assessed in her RFC.  (Tr. 19).  *See Hensley v. Barnhart*, 352 F.3d 353, 357 (8th Cir. 2003) ("[N]o functional restrictions were placed on Hensley's activities, a fact that . . . is inconsistent with a claim of disability.").

The ALJ also discounted the credibility of Plaintiff's complaints related to her ankle injury based on the fact that she received no significant treatment for her ankle injury after her

November 2009 surgery.  (Tr. 16-18).  *See Dukes v. Barnhart*, 436 F.3d 923, 928 (8th Cir. 2006) (upholding an ALJ's determination of credibility due in part to "failure to diligently seek medical care"); *Singh v. Apfel*, 222 F.3d 448, 453 (8th Cir. 2000) ("A claimant's allegation of disabling pain may be discredited by evidence that the claimant has received minimal medical treatment . . . .").  Indeed, at a follow-up appointment on November 25, 2009, the physician did not mention the need for additional care, casting doubt on Plaintiff's claim that she had to elevate her ankle for five hours each day.  (Tr. 47, 718).

Similarly, the ALJ properly discounted Plaintiff's complaints of disabling mental impairments based on the fact that Plaintiff had not sought therapy or been hospitalized for those impairments.  *See Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000) ("The absence of any evidence of ongoing counseling or psychiatric treatment or of deterioration or change in [a claimant's] mental capabilities disfavors a finding of disability.").

Finally, it was appropriate for the ALJ to consider Plaintiff's failure to quit smoking, despite her COPD diagnosis and the advice of her doctors that she quit.  (Tr. 17, 43-44, 179-181, 216, 237, 243).  *See Mouser v. Astrue*, 545 F.3d 634, 638 (8th Cir. 2008) (stating that "[claimant's] continued smoking amounts to a failure to follow a prescribed course of remedial treatment . . . Thus, the ALJ appropriately considered [claimant's] failure to stop smoking in making his credibility determination.").

In sum, the ALJ explicitly discredited claimant's testimony and gave good reasons for doing so, and the Court will defer to the ALJ's credibility analysis.  *See Buckner v. Astrue*, 646 F.3d 549, 558 (8th Cir. 2011) (noting that the court "will defer to the ALJ's credibility finding if the ALJ 'explicitly discredits a claimant's testimony and gives a good reason for doing so'") (quoting *Wildman v. Astrue*, 596 F.3d 959, 968 (8th Cir. 2010)).

### D.  MEDICAL EVIDENCE SUPPORTING THE RFC

Plaintiff also suggests that the ALJ's RFC assessment was not supported by medical evidence.  "The ALJ must assess a claimant's RFC based on all relevant, credible evidence in the record, 'including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'"  *Tucker v. Barnhart*, 363 F.3d 781, 783 (8th Cir. 2004) (quoting *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000)).  "[B]ecause RFC is a medical question, some medical evidence must support the determination of the claimant's RFC."  *Vossen v. Astrue,* 612 F.3d 1011, 1016 (8th Cir. 2010).  "However, the burden of persuasion to prove disability and demonstrate RFC remains on the claimant."  *Id.*

The Court finds that the RFC was supported by medical evidence.  In determining Plaintiff's physical RFC, the ALJ gave significant weight to the evaluation of Dr. Burchett, a consulting examiner.  (Tr. 19).  Dr. Burchett found a normal range of motion in Plaintiff's wrist, only slightly diminished grip strength in her left hand, no shortness of breath, and only mild to moderate respiratory problems.  (Tr. 200).  Although the ALJ acknowledged that there was no medical opinion evidence related to Plaintiff's November 2009 ankle injury, he noted that her fracture had healed and that the medical record did not show any significant treatment after November 2009.  (Tr. 16, 245).  The Court also notes that in a follow-up appointment approximately two weeks after her surgery, although Plaintiff stated that she had trouble walking, she indicated that she was not experiencing pain, and no functional interventions were deemed necessary.  (Tr. 242-43).  In addition, as discussed above, the ALJ conducted a full and proper analysis of the credibility of Plaintiff's subjective complaints.  (Tr. 17-19).  The ALJ properly accommodated Plaintiff's credible physical limitations by limiting Plaintiff to jobs involving only light work and no concentrated exposure to pulmonary irritants.  (Tr. 14).

In determining Plaintiff's mental RFC, the ALJ considered medical opinion evidence from a consultative psychologist who assigned Plaintiff a GAF of 65, indicating mild symptoms, as well as the opinion of a state agency psychologist who found Plaintiff had only very minimal limitations. (Tr. 19). The ALJ properly accounted for Plaintiff's symptoms of depression by finding that she was limited to jobs without a rigorous production pace or strict production standards; was limited to simple routine tasks requiring, at most, occasional reading, writing, and language; and was limited to superficial interaction with co-workers, supervisors, and the general public. (Tr. 14, 19).

In sum, the Court finds that the ALJ's RFC assessment was adequately supported by medical opinion evidence and other medical evidence.

## VI.    CONCLUSION

For all of the foregoing reasons, the Court finds the ALJ's decision is supported by substantial evidence. Accordingly,

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the decision of the Commissioner of Social Security is **AFFIRMED**.

A separate Judgment shall accompany this Memorandum Opinion.


/s/Shirley Padmore Mensah
SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated this 14th day of August, 2013.

21